We'll now hear the next case on the calendar, which is Montagudo v. United States. Thank you. Is it Montiagudo? Montiagudo, yes. Montiagudo. Yes. Okay, thank you. Give me one second. Sure, no problem. I'm just writing the phonetic spelling. All right. So, Mr. Isaac, you have ten minutes, but you've reserved three minutes for a rebuttal. I have, Your Honor. So that's fine. That gives you seven now. You may proceed. Sure. First, good morning. My name is Brian Isaac. I represent the plaintiff's appellant. And you were the trial counsel? I was not. You were not. Just appellate counsel. And I've been doing personal injury cases for close to 40 years now. This is one of the most unusual cases I've seen, not only because of the facts, but because you have an individual working for 47 years at one company. I wish I could have people working in my firm for 47 years. We have people on this court who have worked that long for the company. Yeah, but a machinist is kind of unusual. So let me tell you my position very, very simply. Our position is that under Tobin v. Stiesel, Court of Appeals decision of 64 New York 2nd 254259, an incident or an event which either activates a latent quiescent condition or exacerbates a preexisting condition is a cause as a matter of law. Okay. I mean, I don't think there's any real dispute on the law here. It seems to me that you're disagreeing with Judge Gujarati's finding of facts. I mean, I heard an assessment of credibility of experts, really, right? Well, the answer is yes and no. Certainly I know what the standard is. We have to show clear error in the fact and your- No, but it seems to me that Dr. Creighton gave testimony saying that the injuries to your client's knees and back and wrist were not caused or exacerbated by this accident. Isn't that what he said? That was his conclusion, but my position is that that conclusion doesn't follow from the facts. And let me tell you why as a matter of law. Listen, I could say I'm a judge on the Second Circuit Court of Appeals. It's not evidence because it's just not true. What happened here is this individual, according to my review of the record, if I'm wrong my adversary will tell me, had no prior work problems. He said, I had no prior injuries to my knees. Did he have degenerative changes? Absolutely. Every single part of his body had degenerative changes. He had mastication. He had degeneration. He had disc space problems. He even had a torn ACL and torn menisci that everybody agreed was degenerative. But they were asymptomatic. And my argument is that there is a huge difference legally between a lesion, which does not cause injury, and an event or an accident which does. Example, if someone has a horrible back and the person is even a young person, but never misses a day of work, never goes for treatment, never has any symptoms, and then gets into an accident, if that accident causes that person to miss 90 in the 180 days following the accident, it is a legal cause as a matter of fact and as a matter of law. Now, I know what you're going to tell me. You're going to say, wait a second. How is that fair for someone in this situation who has this degree of degeneration to get a verdict? And my answer is simple. It's not an issue of liability. Serious injury under the 90-180 category and the 5102 and 5104 of the insurance law, even though it deals with damages, is a substantive element that the plaintiff has to prove to have his claim. So that goes to damages. If the district judge in this case said, look, I know for a fact that this occurred, and her holding was very, very clear, if you look on 1406 of the record, this is what she said. The court concludes, I'm quoting, that plaintiff has demonstrated by preponderance of the evidence that plaintiff was restricted in performing substantially all of the material acts that constitute his usual and customary daily activities for 90 out of the 180 days immediately following the accident as a result of knee injuries. Here the evidence of trial established that following the October 20, 2015 accident, plaintiff was not able to return to work until approximately April 25, 2016 due to his knee injuries. If the judge had said there is causation, but I'm not giving you damages, plaintiff. I'm not giving you the $2 million you wanted. I'm not giving you the hundreds of thousands of dollars as a specialist. I'm in a different area. But when you read the Tobin and Stiesel quote, was this a cause? Of course it was. A 30,000-pound vehicle rear-ended my client who was stopped at a stoplight going to work. Could it reasonably be? Can I ask you, what is the clearest error that this court made here? The clearest error is that this had to have been a legal cause because this was a plaintiff who was working. This plaintiff had been working for 47 years. And the notion, and let me put it to you in a way that may bring it into better resonance for you, Judge Park, if I can. The notion that the accident wasn't even 1% responsible for his condition just doesn't make any sense factually and isn't correct in terms of the facts or in terms of the law. But that's the whole thing. There were four experts here that the district court weighed the credibility of. And our review here is for clear error on what the district court assessed, how the district court assessed their testimony. And so, I'm wondering if you could be a little bit more specific about where there was some kind of error that was. The whole thing, the whole assessment. What I'm saying is the district court's error was in failing to distinguish between degenerative conditions, even where objectively severe, which do not cause a particular plaintiff harm, and an incident which does. This plaintiff was in an accident. The notion that this plaintiff wouldn't have gone to work that day, because his degenerative condition of his spine, his knees, and his back, was so bad that it was coming eventually, doesn't follow from the facts, from the testimony- Dr. Rovner and Dr. Kim, I think, did not even identify the degenerative components of his knee conditions. Is that right? That's not correct. I think what the trial court said, if I can, I think I know where you're going. The trial court said that Dr. Rovner and Dr. Kim made a diagnosis before the MRIs were taken. That's true, but everybody acknowledged that this plaintiff objectively, just looking at radiographic x-rays, had severe degeneration. That was years in the making. He just never felt any pain. And that happens. Some people have horrible, objective-looking radiographic tests, but it has no effect on them in their life. And if that's the case, then if you're going to apply the eggshell skull doctrine the way I think it ought to be applied under Tobin against Stiesel, you have to make a finding that there's causation, that the plaintiff sustained a 91-80 category of serious injury, and the way that you make it up, if you feel that the degeneration would have affected the plaintiff in that way, is by taking the damaged section of the ward and just dramatically decreasing it to 20,000, 15,000, 8,000, whatever you want. But to say there's no causation here medically doesn't follow. I don't think it follows from Dr. Creighton's testimony, because Dr. Creighton never said once, and I looked for it all weekend, this plaintiff would have had this condition, would not have been able to do what he couldn't do after the accident without the accident, because it's just not true. I don't want to go over my time. What Dr. Creighton said was that the injuries that he claims to have in his knees are in no way causally related to the accident. Right, and he's using the term injury. I don't think the facts allow that to be classified as an injury. What it is is it's a lesion that was not causing the plaintiff pain. If you have a lesion that's not causing the plaintiff pain, the fact that a doctor calls it an injury doesn't mean that the Tobin against Stiesel rule regarding aggravation of a pre-existing condition or activation of a latent quiescent condition doesn't apply. That would be our response to that. Well, you've reserved some time for rebuttal, Mr. Eisen. Thank you. We'll now hear from Ms. Friesmith. Am I saying that right? Friesmith. Friesmith, I'm sorry. Ms. Friesmith, you have ten minutes. Thank you, Your Honors. Good morning. My name is Megan Friesmith. I'm an assistant United States attorney for the Eastern District of New York, representing Defendant Apley of the United States of America. I was also lead trial counsel at the trial below. The plaintiff seems to be arguing that there was sufficient proof to establish a serious injury, which is a different legal standard than causation, which is really the issue that's on appeal. With respect to the Tobin case that the plaintiff continues to cite, that was a workers' comp case in which, you know, the court did not recognize that a theory of causation could be based on exacerbation of an injury, which is not what the district court here found. There's no dispute that causation could include an exacerbation of an injury. So the district court correctly applied Second Circuit causation law, the legal standard of proximate causation. The plaintiff, though, continues to ignore that Dr. Robner's opinion on causation is not rooted in any objective medical evidence. He did not testify that he objectively saw any acute injury or any indicia of trauma in the MRIs or in the two surgeries that he performed on the plaintiff that would explain how the accident worsened the degenerative condition that all of the experts agree was there, that preexisted the accident. His opinion is based solely on the timing of the plaintiff's complaints of pain following the accident, which is conclusory and speculative and is not the correct legal standard when you have someone with this amount of preexisting injury. Objectively, he actually testified to the contrary, that plaintiff had a degenerative condition including the meniscal and the ACL tears that had been ongoing for over a year, and that's at A591, and that actually existed well before the accident, and that quotes from A630. And those degenerative problems that preexisted the accident were the reasons that he ultimately had the surgery. And furthermore, the district court did not credit Dr. Pugh's testimony, the biomechanic, or the plaintiff's own testimony regarding a mechanism of injury. So even in spite of Dr. Robner's opinion, there's still no credited evidence as to how this accident could have even physically caused any knee injury. So if the court doesn't have any questions, the government is prepared to rest on its briefs and ask the court to affirm the trial court judgment. Thank you. Thank you, Your Honors. So, Mr. Isaac, you have three minutes of rebuttal. Thank you, Your Honors. The Tobin Court, I understood my adversary to say that Tobin was a worker's compensation case, but the rule that I'm quoting from in Tobin is very specific, and here's what it is. And I'm quoting from the Court of Appeals decision. The causation rule, both in tort law and under worker's compensation statute, is that an accident which produces injury by precipitating the development of a latent condition or by aggregating a preexisting condition is a cause of that injury. That's exactly right. I think that's right. I guess it seems that the district court concluded that the accident didn't exacerbate the latent condition, that it didn't do anything, and that seems to be what Dr. Creighton said. Except Dr. Creighton's opinion is not supported by anything other than his review of radiographic testimony, and when he was shown a prior entry, as you know from reading our brief, from the Peninsula Hospital three months before, the plaintiff had no musculoskeletal injuries at all. I'm not arguing, I just want to be clear, I'm not arguing facts per se, because that's a technique that's going to do me to failure. What I'm saying is the interpretation of the facts when applied to the law here was completely wrong, because this was a plaintiff who worked for 47 years. There was no proof from the government that the plaintiff had any problems with his work, no proof that he had any prior symptomatology, no proof that he ever went for treatment for his knees. There was no proof that he ever had any problems with his work. And let me give you a hypothetical just to show what- I would just interrupt to say- Sure. I think you still have three minutes left. I'm sorry. Okay. I'm sorry. Fixing the clock. Judge Sack, I have this one hypothetical, and then I'll let you get back to everyone else. Go ahead. Take me, okay? I think I'm in relatively good shape, but I was a college athlete, and I've had- Where did you play? Soccer and baseball. Really? Okay. I'm 5'9". I was 150 pounds. I didn't run a 4'5", 40. I was lifting weights from the time I was 11 in the 60s, when nobody lifted weights. If you take a look at my back, you will have more radiographic problems than Mr. Montagu. But I don't have anything wrong with me. Yes, I have lesions, objectively, because my body had responses to athletic trainings for years and years and years. I lifted weights for years. Before COVID, I lifted weights. If I go out and get hit by a car, and I can't work for a year, and a doctor comes in and says, Mr. Isaac had horrible radiographic problems with his back, that's not a cause? I think it is, because there's no intervening event that would explain that. And that's my argument. Well, thank you, Mr. Isaac. Thank you, Your Honor. We'll reserve decision. That leads to our last case on the calendar today. In re Jane Doe, but before I clear the courtroom and before I shut off the feed, I want to make sure whether we need to do this as a sealed case at all. Cursed me seeing these visitors that we're talking about First Amendment right here. Right, and nobody has to leave, in my sense, is there. They want to leave. No, no, I understand that. We can't make them stay. That's, well, we could under certain circumstances. But my point is that seeing them there reminds me that this is, that there's a First Amendment right. A subject you know something about. Must be something. Presumption of openness. That's very strong in this court, which is not true of the grievance. What is true here is presumptively open, right? So maybe let me just say this is storms. You've got 10 minutes. You reserve three for rebuttal, but out of the gate, just because it determines how we proceed. Do you have any objection to us not sealing this courtroom and lifting the seal in this case and lifting the using the actual names of the parties going forward? Your Honor, I think if we just called Jane Doe, I think if counsel signed that. Why? We don't believe that it should be sealed at this point. Yeah, I don't see why it should be sealed. So I want to give you a chance, Mr. Storms, to weigh in on this. But I mean, this is a very public disciplinary action against an attorney. There's a presumption of open records. That presumption can be overcome in certain circumstances. But I can't for the life of me think of what that would be in this case. The loose case, Your Honor, is a reputational harm. When you're talking about an attorney and their reputation, there's very serious allegations here. Lying to judges and things of this nature. And I think just the fact that if this was reversed, I think at that point it would be too late that this lawyer's reputation would be destroyed. But even if it's reversed, it's the fact that these salacious allegations were charged against— We hear cases like that all the time where the damage is done by the bringing of the action and being public. That doesn't affect the fact that we have a constitutional duty to do what we do in public and not decide cases in that way. I mean, you can argue, maybe there's a reason to refer to your client as Jane Doe. But even then, the documents that we're ruling on are presumptively, at least the last time this report was there, are presumptively open. You can't do anything about that. Your Honor, to that point, I would just move. There was a motion to stay the imposition of the penalty in the district court that was filed in this court some time ago, which was denied. Which I think further informs the fact that there's really no reason for there to be further sealing at this point. All right. So I'm not going to close and seal the courtroom. I'm not going to shut down the feed for the oral argument. I'll make that clear when we go forward with whatever decision we issue. But we need to cover that before we start. Okay? Anything you want to say before we now proceed? No. Okay. Thank you. So, Mr. Storms, let's now get to the merits. You've got seven minutes out of the gate with three for rebuttal. Okay. Good morning, Your Honors, and may it please the court. My name is Derek Storms from Solomons and Storms, and I represent the appellant in this action. This matter concerns one of the most important rights in our Constitution. And that's the right that a defendant receive adequate notice prior to being charged with a criminal or disciplinary proceeding. Is your argument that the notice here is the same as what would be required in a criminal proceeding? Yes, Your Honor. And I think that this court has held that in Peters and subsequent cases. Even going back to the Supreme Court in Ruffalo, the court said that when an attorney's – an attorney grievance committee is similar to a criminal case, and the Second Circuit has expounded on that in several cases. So I would say yes, that it is the same standard. You may proceed. The appellant was subject to a self-initiated disciplinary proceeding. That's important because I believe that affects the scrutiny. Because it was self-initiated by the committee, the case law in Peters says that there's a heightened standard of review because the committee was – you know, started it, controlled the fact-finding, and controlled the sentence. So just out the gate, I just – we believe that it's a heightened standard. And we believe that the case should be reversed on two reasons. One, there was a lack of notice. And two, that the proceeding was fundamentally unfair. And I'll go through the facts because in these due process cases, it's very fact-intensive. Before you go there, can I just ask quickly, what is it that you want here? My understanding is the suspension has already been – is concluded, the time is up. And so what's the remedy you're asking for? The remedy would be that it be reversed and that, you know, we could have something – corrective action taken, but the remedy would be that it would be reversed so that she could be given a fair trial if that's the case, if the committee wants to have a second go at it. But we would request that it be reversed just on due process grounds because she didn't have a fair hearing. And I'll go into why I believe the hearing was not fair. The committee initially started the grievance with a charging statement. It included a litany of several charges under Rule 3.3. There was no subsection. There's at least six different types of charges that can be charged under Rule 3.3. Therefore, at a pretrial conference, the appellant's counsel requested that a more definite statement be made so that she would receive fair notice of what the charge would be. There was a hearing and the judge looked at the facts and the judge said, I agree, it looks like the charging statement is not fair, it is not clear. And the judge, in order to resolve it, had a conference with committee counsel. Committee counsel agreed to provide a pretrial memorandum that set forth clearly specifically what the charge would be and include the subsections of the charge so that the appellant would know exactly what the charge would be at trial. Committee counsel did that prior to trial. A pretrial memorandum was provided. In the pretrial memorandum, it did not include a false statement charge. A false statement charge is under Rule 3.3, subsection A. That was clearly not in the committee's pretrial memorandum. That's undisputed. Well, it's in the statement of charges, right? There was an initial statement of charges that just said Rule 3.3. For having misrepresented the composition of a law firm to the district court. That's correct, Your Honor. But what happened after the fact is at the pretrial conference, specifically what that was done was to narrow the charges so some charges would be narrowed and some would be clarified. And the pretrial memo was to encompass all the charges at trial. So I don't think the judge wanted the appellant to look at the initial charging document and look at the pretrial memo.  The due process requires fair notice of the charges. And the statement of charges, I think you just acknowledged, included a misrepresentation about the law firm composition. Why does the memo somehow supersede that and render notice inadequate? This is why. Because the memo was a stipulation by the committee which was to do two things. Clarify the charges and narrow the charges and make very clear exactly what the charges would be at trial. So by not including a prior charge, which a committee could have more charges and then reduce charges, by not including that prior to trial, the appellant did not prepare for it. In other words, the appellant didn't see that as agreed to, didn't see that charge, so that wasn't what they prepared for a trial. So in other words, and this is what the court specifically requested, was for them to narrow the charges. That was clear. And by doing that, the appellant's counsel believed they were narrowing the charges. That's what was stipulated to them. So essentially what the committee did is they narrowed the charges in the pretrial stipulation, and then after the trial commenced, they expanded the charge by including a charge that was not in the pretrial memorandum. So at that point, appellant's counsel objected during the hearing, and the judge allowed it to proceed. The trial judge stated basically along the lines of, we'll work it out. We'll see what happens. Appellant's counsel said that doesn't cut it. That doesn't cut it for due process. We haven't prepared witnesses. We haven't prepared her case. Basically, we're getting blindsided and ambushed with a charge that was not included in the pretrial memorandum of law, which is what everybody was on page with. That is what would be the charges at trial, including the judge. And even in the statement of charges are the charges, right? I'm not sure I follow why you suggested the pretrial memorandum, which is designed to just sort of identify what the evidence is going to be, so that there can be objections in advance and the trial can be done efficiently, supersedes the statement of charges. Would you raise your hand? That was a stipulation by the parties, and that was what was agreed to. What was the stipulation? The stipulation was at the pretrial that this is what occurred. Appellant's counsel wanted to do a motion to limit it, wanted to do a motion to dismiss. The way the judge resolved it was she said let's get everybody on board with the charges, let's do a pretrial memorandum, and the committee agreed. Actually, on page 160 of the record, line 2, the committee said absolutely, judge. It was clear that everybody was on the page and that's what they were doing. So even though at some point procedurally the initial statement encompassed some charges, because some were vague, that was clear, later procedurally it was all agreed by all parties that the charges would encompass solely what was in the pretrial memorandum. So I believe what due process requires is fundamental fairness and a fair proceeding. One can at one point include some charges, take them away, and then include them again. That's ambiguous, and actually committee counsel agreed to it. Committee counsel admitted that the process was ambiguous. I don't think ambiguous comports with due process. And as noted, at trial the appellate counsel wasn't prepared. So that's why we feel it should be reversed, the procedure looking at the totality of everything that occurred from the initial charging statement to what happened at the pretrial conference to what happened at the stipulation, looking at all of that context, it's not fair to include a false statement charge, which is the specific one in question, it's the most serious charge. It's not fair to include that charge when that charge was not in the pretrial memorandum. Can I ask you a question just out of curiosity? Is your client still practicing in the Eastern District? Not currently. My client is currently in a coma, Your Honor. What happened after this is my client pretty much got suspended from everywhere. She was in Florida, barred in Florida and other places. She was an immigration attorney. Basically because of the Eastern District, she had to let all her other bars know about it. So she stopped practicing law. She went down to Texas to essentially start a farm is what I think she was doing. She was doing some stuff, farming stuff, and she got in a car accident and she's been in a coma since. I'm sorry. Yes. So if there's no more questions, I'll reserve my rest. Okay. Well, you've got three minutes for a rebuttal. Thank you. Mr. Jackson, you've got ten minutes. Thank you, Your Honor. May it please the court. Randall Jackson on behalf of the Disciplinary Committee for the Eastern District of New York. Your Honors, I think that we have set out the essence of our disagreement with counsel for Ms. Dimitriotis in our brief. There are just a few things that I would highlight. One, I don't think that there was ever a point where there was any stipulation between the parties that what was stated in the pretrial memorandum would somehow negate the fulsome description of the charges that was given in the charging document. Moreover, even if the court could somehow credit that, and that didn't happen. I was counsel of record in the district court, and that simply did not happen. But even if there had been some confusion on the part of Ms. Dimitriotis about whether or not the pretrial memorandum somehow narrowed the charges, there could have been no prejudice to her, and there is no way that counsel for Ms. Dimitriotis in the district court, who is probably one of the most sophisticated and experienced counsels in terms of this area that works in the New York State courts, could have been confused about what was going to be presented at the hearing. Ms. Dimitriotis was questioned about it by counsel for the committee during her deposition. We provided Ms. Dimitriotis' attorney with witness statements from the witnesses that we had interviewed, including Marilyn Pierre, who was the alleged associate that Ms. Dimitriotis lied to the court about. We provided exhibits, including the transcript of the conference that was in question that they claimed that they were not on notice of. And I think it's also important just to note, it's impossible to imagine what different course of action Ms. Dimitriotis' counsel might have taken at the hearing. She was called as a witness. The question for which they claim there was a lack of notice, which by the way, Your Honors, was a very, from my standpoint, a very small part of what was a very, very broad accusation of multiple types of misconduct engaged in by Ms. Dimitriotis in front of numerous judges in the Eastern District of New York. But that conduct, that lying, which was a blatant lie to the court about whether or not Ms. Pierre actually worked at her law firm, I can't imagine what other preparation they could have engaged in with regard to that. She was called as a witness. She had testified in a deposition during the investigation. She was allowed to testify at the hearing. We, even though she was a witness that we intended to call, as a courtesy to counsel for Ms. Dimitriotis, we allowed them to call her first and get their entire case out. We conducted cross-examination. Do I take it, this is a skew, but do I take it that the Agreements Committee holds its hearings in confidential circumstances? I mean, that's the regular approach to new agreements management? Yes, Your Honor. And I'll note there is, there aren't that many full trials of this nature that take place. And because they are typically handled in a confidential manner in order to protect the reputation of attorneys who are subject to grievances, I can't claim to have a fulsome knowledge of how every proceeding has been conducted. But my experience with the Committee suggests that is the way it's typically done, and it was done here that way. Right, but then the Committee makes a public announcement, right? And Peters' cases are similar to this one. Southern, I think, as opposed to Eastern, but they're similar. Yes, Your Honor. Agreements Committee set-offs, right? Yes, Your Honor. Okay. I would just also note very briefly, Your Honor, I think that one of the first questions that the Court posed to Mr. Storms was whether they were arguing for a standard that was as extensive as the discovery, as the due process requirements under the notice requirements under criminal law. What they are essentially arguing for, what Ms. Jarratt is essentially arguing for in her brief, is something I would say that goes far beyond the notice that is required under criminal law. I think the cases that we cited in our brief, both the Dupre case and the D'Amelio case, which is a case I argued in this, which is a case I tried in the district court, is they go to the point that even in a criminal case, the indictment itself is not required to spell out every little bit of information that could come out during the course of the trial. In this court, in multiple decisions, including the Jacobs decision and also in Peters itself, noted that the notion, in Jacobs, this court noted that the notion that an attorney subject to a state disciplinary proceeding enjoys the full panoply of federal constitutional protections that apply to a criminal defendant is groundless. So I think they're arguing for quite a bit more than a criminal defendant gets under the Constitution and under this court's precedence. And if you apply the law as it's been stated repeatedly by this court and by all the courts that have examined this issue, it's quite clear that she got much more than what is necessary under the law, and really an abundant amount of discovery and notice of the specific charges that were issued here. If there are no additional questions, I'll rest on our brief. I appreciate the court's time. Thank you, Mr. Jackson. Thank you, Your Honor. Mr. Starks, you've got three minutes for rebuttal. So, Your Honor, one thing to mention is, and this is on page 178 of the record, this is a quote from committee's counsel. The parties have met and conferred, and counsel for the committee has produced documents consistent with the party's agreement. This is in committee counsel's pre-trial memo of law. Consistent with the party's agreement about what? About what exactly would be presented at trial. Well, Mr. Jackson just said, I think, that the exhibits pre-trial included a transcript of the Pierre statements that you're saying you didn't have notice of, right? Well, I think there's difference between what charges are going to be done and as what the court said is, when a court asks you to identify what are the charges, that's one thing, because that's what they're required to do, list the specific charges and the numbers. But the charges were 3.3. I mean, the charges, the statement of charges were very clear on this. It misrepresented the composition of a law firm to the district court, right? Your Honor, that was the initial charge, but there was other charges. It said 3.3. Under 3.3, there's other sections. There's six subsections under 3.3. That's what part of the problem was. And they can vary from making a false statement to What's the basis for saying that it was not clear that the Pierre statements were going to be fair game at this hearing? It seems to me that that was a very serious allegation of a misrepresentation to the court, and the exhibit of the transcript of that exchange of that statement in court was identified as an exhibit for the hearing, right? Well, Your Honor, that's a piece of evidence that they wanted to use an exhibit, but what we're getting at is the notice. We're not getting into the evidentiary material. We're getting into the notice prior to the hearing, and the agreement was But you had the exhibit prior to the hearing, right? I don't know exactly what point. I'm sure it was at some point in time it was done, and I think there was other exhibits introduced at trial. I mean, I wasn't in trial, but what we're getting at is the notice. The pretrial memo, the court specifically said, and committee counsel agreed, we will provide the exact charges irrespective of what is done in the initial charging document. We are going to provide the exact charges. That's an agreement. That's on page 178 of the record. And then going to what committee counsel said, the appellant did have very experienced trial counsel, and this is what he said at trial. This is page 460 of the record, lines 19 to 22. We just recently learned that the judge is citing for a misrepresentation which is not in the charge. Essentially what's going to happen is that our prior preparation is down the drain. The reason he said that is because there was an agreement between the parties which the judge put together and the committee agreed to, which is very important, that the committee would narrow the charges and clarify the charges in its pretrial memo. By not including the false statement charge in its pretrial memo, essentially, in fact, what it did is appellant's counsel did not think that the committee were including that charge. So, yes, at some point in time, maybe that charge months ago or maybe a year ago, an initial charging document might have been there, but one or two months before trial it was not, and that is the document that all parties had agreed to and the judge that would define the scope of the trial. So what is the prejudice? The prejudice is that my client and her attorney were not prepared for this charge. What is there to prepare for? This is something that certainly everybody knew about. There is testimony. There is an exhibit that summarizes the testimony.